IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

United States of America,        ) Criminal Action
                                  ) No. 1:20-cr-00179-KBJ-1
                    Plaintiff,    )
                                  ) **Oral Ruling on Motion**
vs.                               ) (via Zoom)
                                  )
Walter Lee Goodman,               ) Washington, D.C.
                                  ) April 16, 2021
                    Defendant.    ) Time:  11:00 a.m.

_____

Transcript of **Oral Ruling on Motion** (via Zoom)
Held Before
The Honorable Ketanji Brown Jackson (via Zoom)
United States District Judge

_____

A P P E A R A N C E S

For the Plaintiff:        **Kimberly L. Paschall**
(via Zoom)                U.S. ATTORNEY'S OFFICE FOR THE
                          DISTRICT OF COLUMBIA
                          555 Fourth Street, Northwest
                          Washington, D.C. 20530

For the Defendant:        **Cara K. Halverson**
(via Zoom)                FEDERAL PUBLIC DEFENDER FOR THE
                          DISTRICT OF COLUMBIA
                          625 Indiana Avenue, Northwest
                          Suite 550
                          Washington, D.C. 20004

_____

Stenographic Official Court Reporter:
(via Zoom)                Nancy J. Meyer
                          Registered Diplomate Reporter
                          Certified Realtime Reporter
                          United States Courthouse, Room 6509
                          333 Constitution Avenue, Northwest
                          Washington, D.C. 20001
                          202-354-3118

P R O C E E D I N G S

(REPORTER'S NOTE:  This hearing was held during the COVID-19 pandemic restrictions and is subject to the limitations of technology associated with the use of technology, including but not limited to telephone and video signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing.)

THE COURTROOM DEPUTY:  This is Criminal Case 20-cr-179, United States of America v. Walter Lee Goodman.

Starting with government counsel, please state your appearance for the record.

MS. PASCHALL:  Good morning, Your Honor.  Kimberly Paschall for the United States.

THE COURT:  Ms. Paschall.

MS. HALVERSON:  Good morning, Your Honor.  Cara Halverson for Mr. Goodman.

THE COURT:  Ms. Halverson.  And I see that Mr. Goodman is present by video.

I have scheduled this conference for the purpose of rendering an oral ruling on the pending motion to suppress tangible evidence that Defendant Walter Goodman has filed.

As the parties know, Mr. Goodman has been charged with one count of unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1) based on a firearm that Mr. Goodman had on his person when the

1    police encountered him standing in front of a convenience store

2    on August 27th, 2020.  According to the government, the police

3    officer who engaged with Mr. Goodman outside the store and then

4    searched and seized him to discover the weapon had reasonable

5    suspicion that Mr. Goodman was armed and, thus, the search and

6    seizure was legally justified under the Fourth Amendment.

7         In its motion to suppress, the defense argues that the

8    officer seized Mr. Goodman unlawfully at the outset of the

9    encounter because Mr. Goodman was not free to leave when the

10   officer approached and the officer did not have reasonable

11   suspicion that criminal activity was afoot at the time of that

12   approach.  The defense argues further that regardless, the

13   officer lacked reasonable suspicion that Mr. Goodman was armed

14   and, thus, the search and seizure that led to the discovery of

15   the weapon contravened the Fourth Amendment.

16        The Court held an evidentiary hearing with respect to

17   the suppression motion last week on April 9th, 2021.  Both

18   before and during that hearing the parties submitted evidence

19   concerning the events that took place prior to Mr. Goodman's

20   allegedly unlawful search and seizure.

21        Officer Bewley, the officer who discovered the firearm

22   on Mr. Goodman's person, testified during the hearing about the

23   events that led to the recovery of the firearm, and the

24   government also submitted and displayed body-worn camera

25   footage from Officer Bewley and two other officers,

1    Sergeant Jaquez and Officer Sanders, as well as several still

2    images from those videos.

3         For its part, the defense submitted and showed several

4    additional images from the officer's body-worn camera footage.

5         After review of the evidence and the applicable law, the

6    Court is prepared to rule on the motion to suppress.  I will

7    start by laying out my findings of fact concerning the events

8    at issue and will then summarize the arguments that Mr. Goodman

9    has made in its motion to suppress and the contentions that the

10   government has advanced in its opposition brief.

11        With respect to the Court's own legal analysis, I will

12   lay out the legal standards applicable to Mr. Goodman's motion

13   to suppress and address the primary questions of law that the

14   defense's motion presents, which is whether Mr. Goodman was

15   unlawfully seized at the time that Officer Bewley stepped in

16   front of him and, if not, whether once Mr. Goodman was actually

17   seized, the bulge that Officer Bewley claims he saw in front of

18   Mr. Goodman's pants and the actions during the encounter

19   provided Officer Bewley with sufficient reasonable suspicion to

20   seize Mr. Goodman and search for weapons.

21        So starting with the findings of fact.  On August 27th,

22   2020, at approximately 5:00 p.m., 13 plainclothes members of

23   the Metropolitan Police Department's gun recovery unit,

24   including Officer Bewley, responded to an incident a few blocks

25   away from the corner store on the 5500 block of Central Avenue,

Southeast, in Washington, D.C.  Officer Bewley testified that

he was not sure what the other incident that they were

responding to involved, but he stated that he was, quote,

positive it had to do with gun violence or sounds of gunshots

or something to do with guns since that was our main focus,

end quote.

According to Officer Bewley, after responding to that

incident, the officers, quote, were driving around, end quote,

and at approximately 5:12 p.m., the group of officers who were

traveling together in three or four unmarked police cars pulled

into the block of 5500 Central Avenue, Southeast.  The block

includes a convenience store located at 5575 Central Avenue,

Southeast.  Officer Bewley testified that he was aware at that

time that the MPD narcotics division had received complaints

about drug transactions in front of that store on previous

occasions, but he could not recall the exact date or time he

learned of those complaints.  And he testified that the

officers were not responding to any reports of drug activity,

possession of firearms, or people blocking the entrance to the

store on this occasion.

The convenience store was in a gray brick building with

a flat front, and the door to the store was slightly inset near

the right end of the building.  Two men were standing to the

left of the entrance of the store, both were shirtless and

wearing jeans or jean shorts with the top of their underwear

exposed.

One man, later identified as Mr. Goodman, was standing just to the right of the entrance of the store with his back to a concrete barrier at the edge of the building and a chain-link fence behind him and to his left. Mr. Goodman was wearing a white sleeveless undershirt and tight, light gray jeans, also with the top of his underwear visible. A fourth man was standing further to the right of the store entrance -- that is, to Mr. Goodman's left -- and in front of the chain-link fence. He was wearing a black t-shirt and jeans.

According to Officer Bewley, the officers stopped their vehicles in front of the convenience store because they observed that there were people standing in front of the corner store, but Officer Bewley noted that the officers had no particular information about the group of people standing in front of the store.

Officer Bewley testified that as the officers stopped their vehicles, another man who was standing outside in front of the store, in addition to the four men previously described, ran into the store. Officer Bewley said that the officers believed that that man was going to run in there and hide something, either drugs or a firearm. So the officers decided to exit their vehicles, and they did so, quote, a little bit faster than they normally would do, end quote.

The body-worn camera footage shows one officer running

into the convenience store and then three more officers walking

into the store after him.  The officers were all wearing

plainclothes, such as jeans and T-shirts, as well as police

vests labeled with the officer's name in the front and police

in large capital letters on the back.  All of the officers were

also carrying their service weapons.

As these police officers were walking toward the

convenience store, Officer Bewley opened the door of his

vehicle, stepped out, and quickly walked up to the group of

four men standing just outside the door to the store.  He

stopped at the center of the group in the front of the door to

the store, a few feet away from the men.  Officer Bewley

testified that it was his intention when he walked up to the

group of men to tell them not to obstruct the store, but the

body-worn camera footage reveals that Officer Bewley neither

asked Mr. Goodman or the other men not to obstruct the entrance

to the store, nor did those individuals appear to be blocking

the entrance to the store.

Instead, as Officer Bewley walked up to the group, when

he was a few feet away from them, he said to them, "What's up?

No guns out?  No guns out here; right?"  It is difficult to

hear the men's responses on the video footage, but according to

Officer Bewley, all four men said no.  The second man from the

left also briefly raised his hands over his head, and the man

furthest to the right also lifted up his shirt to expose his

1    waistband area.

2         At this time at least two additional officers walked up

3    to the group.  One officer stood several feet behind

4    Officer Bewley, slightly to Officer Bewley's right, and

5    Officer Sanders stood several feet behind Officer Bewley, to

6    Officer Bewley's left, next to a scooter or moped.

7         Officer Bewley testified that he looked at the men's

8    waistbands and saw a bulge in the upper front area of

9    Mr. Goodman's pants between his zipper and his left pocket.

10   According to Officer Bewley's testimony, the bulge appeared to

11   be, quote, hard metal, end quote -- a hard metal object and

12   with a, quote, hard edge, end quote.  Officer Bewley then took

13   two steps toward Mr. Goodman and asked, "What's up with that"

14   and pointed at the bulge in Mr. Goodman's pants.  At that

15   point, a woman and child exited the store, and another officer,

16   Sergeant Jaquez, entered the store.

17        In response to Officer Bewley's question, Mr. Goodman

18   put his right hand in his right pocket and said, "It's a

19   lighter, Bro.  It's a lighter," and removed two lighters from

20   his pocket, but according to Officer Bewley, he observed that

21   the bulge in Mr. Goodman's pants was still visible.

22   Officer Bewley said, "No, no, no.  There's like something

23   poking out right here," and he pointed to the bulge in

24   Mr. Goodman's pants again.

25        Mr. Goodman responded, "It's a lighter.  It's nothing."

1    Officer Bewley replied, "No, it's not.  I'm going to check and

2    make sure.  I'm going to see what this is; okay?"  One of the

3    officers who had gone into the convenience store emerged from

4    the store and stood to Mr. Goodman's right, and the officer who

5    had been standing off to Mr. Goodman's left moved toward

6    Mr. Goodman's left side.

7         Mr. Goodman then slightly moved his right hand and

8    placed it on his pants in front of the area to which

9    Officer Bewley had been pointing.  Officer Bewley said, "Stop,

10   stop," put his hand over Mr. Goodman's hand, and pushed

11   Mr. Goodman's hands off of Mr. Goodman's pants.

12        The officer who had exited the store grabbed

13   Mr. Goodman's right fore- -- forearm and pulled Mr. Goodman's

14   arm to the right side, and the officer standing to

15   Mr. Goodman's left grabbed the left side of Mr. Goodman's

16   torso.  Officer Bewley then grabbed what he characterized as a

17   bulge in Mr. Goodman's pants, manipulating the area with his

18   fingers, and according to Officer Bewley's testimony, he felt

19   what he believed to be a metal object in the shape of a

20   firearm.

21        Officer Bewley then shouted 1-800, the gun recovery

22   unit's code word for a firearm, and several of the officers

23   placed Mr. Goodman in handcuffs.  Officer Bewley then pulled

24   down the front of Mr. Goodman's pants to reveal a firearm in

25   Mr. Goodman's crotch area secured by his underwear.  About a

minute later, one of the officers removed the firearm from

Mr. Goodman's underwear, and according to the government's

statement of facts, the firearm was later determined to be a

Taurus Model G2S .40 caliber semiautomatic handgun loaded with

one round in the chamber and six rounds in a six-round capacity

magazine.

Those are the Court's findings based on the testimony

during the hearing and the video footage and photographs that

the parties have submitted.

I will now briefly summarize the legal arguments that

the parties have advanced in their briefs concerning

Mr. Goodman's motion to suppress.  Mr. Goodman contends that

the firearm recovered from his person was the fruit of a

seizure and search that were unlawful under the

Fourth Amendment for two independent reasons.  First,

Mr. Goodman contends that he was seized within the meaning of

the Fourth Amendment by the show of authority that the police

officers engaged in when Officer Bewley stepped in front of

him.

According to Mr. Goodman, several circumstances

supported the notion that a reasonable person in Mr. Goodman's

position would not have felt free to terminate the encounter

with Officer Bewley.  Mr. Goodman's back was to a concrete wall

such that Officer Bewley was blocking his path to leave.

Officer Bewley and the -- and the 12 other officers who stopped

in front of the convenience store wore vests marked police and had their service weapons visible, and Mr. Goodman saw that an officer pursued another individual who did attempt to leave by going into the store. Mr. Goodman argues further that such a seizure was not justified because Officer Bewley lacked reasonable and articulable suspicion that Mr. Goodman was engaged in criminal activity.

Second, Mr. Goodman argues that even if he was not seized when Officer Bewley stepped in front of him, the subsequent search of his person when Officer Bewley placed his hands on the purported bulge in Mr. Goodman's pants was unlawful under the Fourth Amendment because Officer Bewley lacked reasonable and articulable suspicion that Mr. Goodman was armed and dangerous. In particular, Mr. Goodman asserts that even if Officer Bewley saw a bulge in Mr. Goodman's pants, Officer Bewley did not have sufficient information to reasonably suspect that the bulge was a weapon as opposed to some other object.

I'm checking -- it looks as though the public line is not muted. Can we take care of that, Ms. Franklin?

THE COURTROOM DEPUTY: Okay. I have it.

THE COURT: Moreover, and finally, Mr. Goodman maintains that a protective pat-down requires the officer to have reasonable suspicion that an individual is both armed and dangerous. And according to Mr. Goodman, Officer Bewley lacked

any indication that Mr. Goodman presented a danger to anyone's safety, as, quote, Mr. Goodman stood still, was compliant with the officers, and kept his hands observable during the entire interaction. That was a quote from the defendant's motion.

And Mr. Goodman contends that because the firearm recovered from his person was the product of an unlawful seizure or search under the Fourth Amendment, the exclusionary rule requires suppression of the evidence of the recovery of the firearm.

In its opposition, the government argues that no unlawful search or seizure occurred during the encounter between Officer Bewley and Mr. Goodman. To start, the government asserts that the interaction preceding the pat-down was a lawful citizen contact rather than a Fourth Amendment seizure. According to the government, a seizure does not occur simply because a police officer approaches an individual and asks a few questions so long as a reasonable person would feel free to disregard the police and go on about his business.

The government contends that Officer Bewley did not seize Mr. Goodman at the outset of their interaction because Officer Bewley did not raise his voice or draw his weapon and used a conversational tone when he talked to Mr. Goodman, whether he -- and asked whether he had a gun and inquired about the bulge in his pants. Indeed, according to the government, Mr. Goodman could easily have walked past Officer Bewley if he

1    wanted to leave the interaction.

2         The government does concede that Mr. Goodman was seized

3    at the point in which Officer Bewley placed his hands on

4    Mr. Goodman to pat him down, but it contends that both this

5    seizure and the pat-down were lawful because at that point

6    Officer Bewley reasonably believed that Mr. Goodman had an

7    illegal firearm and, thus, was armed and dangerous.

8         In particular, the government asserts that

9    Officer Bewley's suspicion was reasonable for three reasons:

10   first, because Officer Bewley observed a bulge in Mr. Goodman's

11   pants; second, because Mr. Goodman, quote, deflected by saying

12   it was his lighter, end quote, when he was asked about the

13   bulge; and third, because Mr. Goodman moved his hand to cover

14   the area of his pants to which Officer Bewley pointed.  The

15   government thus contends that the recovery of the firearm from

16   Mr. Goodman's person was the product of a lawful search and

17   seizure and, therefore, should not be suppressed.

18        Turning to the legal standards that this Court has used

19   to evaluate the parties' arguments, the Fourth Amendment to the

20   United States Constitution guarantees the right of the people

21   to be secure in their persons against unreasonable searches and

22   seizures.  The basic purpose of the Fourth Amendment is to

23   safeguard the privacy and security of individuals against

24   arbitrary invasions by government officials.  The Supreme Court

25   has recently reiterated that a Fourth Amendment seizure of a

person can take the form of a physical force -- excuse me --
can take the form of physical force or a show of authority that
in some way restrains the liberty of the person.  And a search
for Fourth Amendment purposes occurs when, for instance, the
government obtains information by physically intruding on a
constitutionally protected area, such as an individual's
person.

The Fourth Amendment's protection against unreasonable
searches and seizures requires that searches and seizures be
found -- founded upon an objective justification.  In
particular, while a Fourth Amendment seizure generally must be
supported by probable cause, a Fourth Amendment search is
presumptively unreasonable unless conducted pursuant to a
warrant issued by a judicial officer upon a finding of probable
cause.

As particularly relevant here, however, in a case called
*Terry v. Ohio*, the Supreme Court recognized a narrow exception
to the probable cause requirement.  Pursuant to that exception,
an officer may justify a brief investigatory stop by providing
a, quote, reasonable, articulable suspicion that criminal
activity is afoot, end quote.  And during such a seizure of a
person, the officer may conduct a, quote, reasonable search for
weapons for the protection of the officer, where he has reason
to believe that he is dealing with an armed and dangerous
individual, end quote.

Notably, however, the Supreme Court has emphasized that the authority to conduct such a protective search is narrowly drawn. Thus, although an officer need not be absolutely certain that an individual is armed to justify a *Terry* frisk, the officer must be able to point to, quote, specific reasonable inferences, end quote, more than just an -- a, quote, inchoate and unparticularized suspicion or hunch, end quote, that supports the belief that the subject of the search may have a weapon. There I was quoting from the *Terry* case itself.

Finally, subject to certain exceptions, not implicated here, when the government conducts an unconstitutional search, the Court must exclude any evidence obtained as the fruit of that search or seizure. The proponent of a motion to suppress generally bears the burden to show that his Fourth Amendment rights were violated by the challenged search or seizure. But where, as here, the government conducts a warrantless seizure or search, the burden shifts to the government to justify its actions by demonstrating that the officer acted consistently with the Fourth Amendment requirements for such a warrantless seizure or search.

With respect to this Court's analysis of the motion at issue here, the Court is mindful that the threshold task for any Court faced with the Fourth Amendment seizure issue is to determine when, if at all, a Fourth Amendment seizure

1    occurred.

2         The parties here dispute whether Mr. Goodman was seized

3    when Officer Bewley stood in front of Mr. Goodman, as

4    Mr. Goodman contends, when Officer Bewley placed his hands on

5    the alleged bulge in Mr. Goodman's waistband as the government

6    asserts, or perhaps even at some intermediate point in the

7    encounter.  But because there is no dispute that Mr. Goodman

8    was, in fact, seized for Fourth Amendment purposes at the time

9    his hands were pinned by the other officers and Officer Bewley

10   grabbed the alleged bulge in front of his pants, this Court

11   does not necessarily need to determine whether a seizure had

12   occurred at a prior point in the interaction.

13        The Court can and will start its analysis by considering

14   whether the undisputed seizure and search was lawful, and to

15   that extent, that end, the Court assumes without deciding that

16   Mr. Goodman was not seized until Officer Bewley physically

17   touched Mr. Goodman as the government asserts.  Thus, the Court

18   has focused its attention, at least primarily, on whether

19   Officer Bewley had a reasonable suspicion that criminal

20   activity was afoot and that Mr. Goodman was armed and dangerous

21   when he grabbed Mr. Goodman's pants.

22        In this regard, let me be clear at the outset that

23   nothing in the record establishes that the officers had any

24   information about any criminal conduct whatsoever by the

25   individuals standing in front of the store or otherwise when

they arrived at the convenience store preceding the events in question. Likewise, there is no dispute that the four individuals who were standing outside the store, including Mr. Goodman, did nothing to suggest that they were engaged in criminal activity as the officers stopped and approached the group.

The primary factual dispute between the parties concerns the bulge that Officer Bewley allegedly observed in Mr. Goodman's pants once Officer Bewley had stepped in front of the group.

Defense counsel urges this Court to reject Officer Bewley's testimony that he saw a bulge in the front of Mr. Goodman's pants between his right pocket and zipper area, and the defense argues that, regardless, any such bulge does not give rise to a reasonable suspicion that Mr. Goodman was armed. As I will explain in a moment, this Court largely agrees. The Court has reviewed the officer's body-worn camera video and the still images, several times, and I still do not see any noticeable protrusion between Mr. Goodman's zipper and his right pants pocket, at least at the beginning of the encounter.

There is, perhaps, one point in Officer Bewley's body-worn camera footage at the moment captured in Government Exhibit 1-D in which the camera angle shifts slightly to Mr. Goodman's left side just before Officer Bewley places his

hand on Mr. Goodman's crotch area. And in that angle at that

moment, a bulge is arguably more apparent. The Court generally

found Officer Bewley's testimony to be credible, however, and

it was certainly corroborated -- that is, his testimony that he

saw something -- was certainly corroborated by the fact that in

the moment, in the video, Officer Bewley singles out

Mr. Goodman and points to his pants. And this suggests that

Officer Bewley did see something, some bulge, in the area that

he was pointing to.

But the Court declines to credit Officer Bewley's

statement during his testimony that the bulge he allegedly

observed in Mr. Goodman's pants appeared to be hard metal or

that it was a hard metal object or that the object appeared to

have a hard edge, because Officer Bewley did not explain how he

came to believe that the object was made of metal, and in my

view, Officer Bewley's body-worn camera footage does not

corroborate that specific description of any alleged bulge.

So the legal question that remains before the Court,

assuming that Officer Bewley did see something, was whether

Officer Bewley had a reasonable suspicion that Mr. Goodman had

a firearm when he grabbed the bulge in Mr. Goodman's pants as

required to justify the search and seizure that the government

concedes occurred at that point.

For the reasons I will explain, the Court concludes that

the government has failed to meet its burden to show that

Officer Bewley had a reasonable suspicion that Mr. Goodman was armed when he searched Mr. Goodman for weapons, and, thus, the frisk that led to the discovery of the firearm on Mr. Goodman's person was unlawful under the Fourth Amendment. As a result, the defendant's motion to suppress will be granted.

By way of explanation, let me start by emphasizing that the only criminal activity that the government has suggested may have been afoot when Officer Bewley frisked Mr. Goodman was the illegal possession of the firearm itself. Consequently, the propriety of both the seizure and the search here turn on whether Officer Bewley had reasonable suspicion to believe that Mr. Goodman had a firearm at the time Officer Bewley frisked the bulge in Mr. Goodman's pants.

As I previously mentioned, the authority to conduct a protective frisk under *Terry* is narrowly drawn, and the officer's belief that the individual is armed and dangerous must be based on specific and articulable facts and specific reasonable inferences from those facts in light of the officer's experience, rather than merely an inchoate and unparticularized suspicion or hunch. The ultimate inquiry is whether a reasonably prudent officer in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in making that determination, courts examine the totality of the circumstances to determine whether reasonable suspicion existed in any given case.

1          Applying those principles to the facts at hand and

2     giving due respect to Officer Bewley's extensive experience

3     with the MPD's gun recovery unit, this Court, nonetheless,

4     concludes that Officer Bewley lacked the necessary objectively

5     reasonable suspicion that Mr. Goodman was armed at the time of

6     the frisk.  The first circumstance that the government relies

7     upon is the fact that Officer Bewley saw a bulge in the front

8     of Mr. Goodman's pants, but, critically, the government

9     concedes merely observing a bulge under those circumstances

10    would not have been sufficient to justify a warrantless search

11    of Mr. Goodman's person if Mr. Goodman had, for example,

12    declined to answer Officer Bewley's questions.  In other words,

13    the bulge alone did not give rise to a reasonable suspicion

14    that Mr. Goodman was armed.

15          In the government's view, two subsequent events that

16    arose during the course of the encounter provided the requisite

17    cause to believe that Mr. Goodman had a gun:  first, the fact

18    that the bulge remained after Mr. Goodman removed lighters from

19    his pocket; and second, Mr. Goodman's subsequent attempt to

20    cover the bulge with his hand.  But in this Court's view, these

21    additional facts add little to the relevant inquiry and even

22    when considered together do not support anything more than a

23    mere hunch that Mr. Goodman was armed.

24          Starting with the removal of the lighters, the Court

25    finds it significant that this circumstance provided no

affirmative evidence whatsoever that Mr. Goodman was actually

armed.  Again, the government concedes that Mr. Goodman could

have declined to respond to Officer Bewley's questions

altogether.  And this is not a situation in which

Officer Bewley saw anything other than the bulge related to

firearms or had any other information concerning a weapon, such

as the common scenario when the officers approach and a

defendant lifts his shirt to show the officer the waistband

area and a part of the gun is actually visible.

Here Mr. Goodman pulled two lighters out of his pocket,

and this unsuccessful attempt to explain the bulge in his pants

is at most the elimination of one possibility for what the

bulge could be.  But it did nothing, in this Court's view, to

increase the likelihood that the bulge was -- was specifically

a weapon rather than some other object, like a phone, a wallet,

something having to do with incontinence, a medical device, or

even that it could be something else like drugs.

It is true that courts have suggested that an officer

can still have a reasonable suspicion even if there's a

possibility of other innocent explanations for what have been

observed and a reasonable suspicion determination need not rule

out the possibility of innocent conduct entirely.  But in my

view, Mr. Goodman's voluntary and unsolicited removal of the

lighters from his pocket did not sufficiently eliminate the

possibility that the observed bulge was something else and,

1    thus, did not justify a reasonable belief that the bulge was,

2    in fact, a gun.

3         Put another way, the Court rejects the government's

4    suggestion that an officer with a hunch can question a

5    defendant who would otherwise have a right not to respond at

6    all, and if the defendant attempts to but fails to dispel the

7    officer's hunch about whether the defendant is armed, then that

8    alone gives the officer reasonable suspicion to proceed with

9    the search.  That argument seems to shift the burden to the

10   defendant that distorts the *Terry* standard.

11        To the contrary, when it seeks to conduct a warrantless

12   search of an individual, it is the government that bears the

13   burden to show that the officer had an objectively reasonable

14   belief, based on particularized facts and inferences, that the

15   individual was armed and dangerous.  And in this Court's view,

16   that belief cannot be reasonably based on a defendant's failure

17   to satisfy the officer that he is not so armed when he is

18   questioned.

19        The additional fact that Mr. Goodman covered the

20   supposed bulge with his hands adds even less to the reasonable

21   suspicion calculus.  First of all, on Officer Bewley's

22   body-worn camera footage, Mr. Goodman's hand movement at the

23   time that Officer Bewley points to the front of his pants was

24   very slight and appears to be nothing more than a reflexive

25   reaction to Officer Bewley repeatedly pointing to and focusing

1    on his crotch area.

2        The government did see -- excuse me.  The Court did see

3    Mr. Goodman move in the video, but the slight hand movement was

4    a far cry from the furtive gestures that other courts have held

5    to be sufficient to justify a reasonable belief that an

6    individual is armed.  For instance, Mr. Goodman did not try to

7    turn one side of his body away from approaching officers or

8    touch and hold his waistband while fleeing from the police.

9    Instead, in response to Officer Bewley pointing to the area and

10   specifically asking him about it repeatedly, Mr. Goodman moved

11   his hand to a place -- to the place that was the subject of

12   Officer Bewley's focus.  And like the prior effort to remove

13   lighters from his pocket, Mr. Goodman's hand motion did little

14   to indicate that the bulge in his pants was a gun.

15       During the hearing, the government made clear its views

16   that the bulge itself, plus pulling out the lighters, plus the

17   hand movement was together the sum total of its contention

18   concerning reasonable suspicion.  The Court notes, however,

19   that to the extent that the government is also relying on the

20   fact that this entire encounter occurred in an allegedly

21   high-crime area, that fact, likewise, fails to move the needle

22   with respect to the reasonable suspicion analysis.

23       Although it is well established that whether the

24   encounter occurred in a high-crime area is among the relevant

25   contextual considerations in a *Terry* analysis, the

Supreme Court has been equally clear that, quote, even in high-crime areas where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted, end quote. And under the circumstances presented here, this Court finds it significant that notwithstanding the area in which the convenience store was located, Officer Bewley testified that the unit had not received any complaints about individuals possessing firearms or selling narcotics or doing anything else outside that convenience store at the time of the events at issue.

The fact that the police department may have received complaints about narcotics sales around the store on other occasions is not probative of whether Mr. Goodman in particular had a weapon or was engaged in criminal activity on this specific occasion. Consequently, the additional fact that this encounter occurred in a high-crime area does not transform the other circumstances known to Officer Bewley into a reasonable and articulable suspicion.

The Court also knows -- notes that the government has not identified any Supreme Court or D.C. Circuit cases upholding *Terry* frisks on facts similar to those here, and this Court has not located in any binding authority compelling such a conclusion. For instance, the Court does not read the Supreme Court's decision in *Pennsylvania v. Mimms*,

434 U.S. 106, as holding that a *Terry* pat-down is justified whenever an officer observes a bulge in an individual's clothing.  In *Mimms*, the police already had probable cause to believe that the defendant had committed at least one offense at the time of the protective frisk, and that circumstance is not present here.

Moreover, in the D.C. Circuit decisions that have upheld *Terry* pat-downs, the officers had stronger evidence that the individual was actually armed.  For example, in *United States v. Bullock*, 510 F.3d 342, the D.C. Circuit held that a protective frisk was justified where the defendant's pants were unbuttoned when the officer walked up to the defendant's car and the defendant made furtive hand gestures with his hands by repeatedly moving his hands toward his lap area, providing affirmative reason to believe that the defendant might be in the process of trying to conceal a weapon there.

In United States v. Abus-Prince [sic] -- Abdus-Prince [sic] -- excuse me -- 518 F.3d 926, the D.C. Circuit upheld a *Terry* frisk where officers had stopped the defendant's car because it matched the description of a vehicle that had been used in a recent robbery.

And in *United States v. Johnson*, 212 F.3d 1313, the D.C. Circuit held that a *Terry* pat-down was lawful where officers reasonably suspected that the defendant had just participated in a drug transaction making -- made several

shoving-down motions before raising his hand in response to the officer's orders, and had a bulge in his pants pocket.

By contrast, in this Court's view, the facts of this case are closer to those in *United States v. Spinner*, 475 F.3d 356, which is D.C. Circuit (2007). There the defendant looked as though he might have been fiddling with the center console while he was seated in the rear of the truck and acted nervous when the police asked for consent to search the vehicle. The D.C. Circuit held that these facts did not give officers reasonable suspicion to believe that the defendant was armed and dangerous so as to justify a search of his truck under *Terry* and the related car frisk doctrine of *Michigan v. Long*. As the D.C. Circuit aptly explained, quote, there is a logical gap between those facts which support only the inference that the defendant may have put something, perhaps contraband, in his truck and the conclusion that the police were dealing with an armed and dangerous individual, end quote.

And to the extent that the D.C. Circuit and the Supreme Court have both made crystal clear that the police can only seize and search individuals without a warrant under similar circumstances when there is reasonable belief that there is criminal activity afoot and the individual is armed and dangerous, absolutely nothing in the videotaped interaction that these parties have provided to the Court supports the conclusion that Mr. Goodman meets those criteria.

1    Mr. Goodman was standing.  He was calm.  He had no

2    reaction to the police officer's inquiry of him in terms of

3    nervousness or anything else.  He engaged with the officer in

4    an ordinary, normal manner.

5         Thus, in the Court's view of the video, rather than a

6    public service-type community caretaking interaction, the

7    events that transpired between Officer Bewley and Mr. Goodman

8    appear to exemplify the troubling observations that Judge Brown

9    articulated in 2015 in her concurrence in the *United States v.*

10   *Gross* when she bluntly described the MPD's gun recovery unit

11   standard practices as follows:  Officers randomly trawl

12   high-crime neighborhoods asking occupants who fit certain

13   statistical profiles, mostly males in their late teens to early

14   40s, if they possess contraband.  Despite lacking any semblance

15   of particularized suspicion when the initial contact is made,

16   the police then subject these individuals to intrusive searches

17   unless they can prove their innocence.

18        Indeed, this Court notes that the techniques that

19   Judge Brown proceeded to describe in *Gross* are strikingly

20   similar to the ones employed here.  That is, as Judge Brown

21   said, in the absence of any particularized reports, evidence,

22   or suspicions, patrolling officers simply question every likely

23   person they encounter, they employ a simple technique.  They

24   ask any individual they encounter if he or she has a gun and

25   then watch to see if that individual engages in what the

1    officers perceive to be suspicious behavior.  If consent to

2    question or search is refused, officers frequently construe

3    citizen's reactions to their probe as rationalizing a *Terry*

4    stop.

5          Now, this Court recognizes, and Judge Brown

6    acknowledged, that the D.C. Circuit's case law generally

7    authorizes such searches under certain circumstances, although

8    Judge Brown lamented that authority, and in her concurrence,

9    she implored the circuit to reconsider it.

10         This Court notes that reviewing the circumstances here,

11   notwithstanding the D.C. Circuit's case law that generally

12   allows the MPD gun unit to act in this fashion, it is clear

13   that even the circuit's general endorsement of these types of

14   practices is not enough to support the search at issue here.

15   There was simply insufficient suspicion to justify the search

16   of Mr. Goodman.

17         So to briefly summarize, this Court concludes that the

18   government has not met its burden to show that Officer Bewley

19   had reasonable suspicion to believe that Mr. Goodman was armed

20   and dangerous before he frisked Mr. Goodman's pants.  Thus, the

21   frisk was an unlawful search or seizure under the

22   Fourth Amendment, and the firearm and ammunition recovered from

23   Mr. Goodman's person was a fruit of that unlawful search and

24   seizure.  Because the government does not attempt to invoke any

25   exceptions to the exclusionary rule, Mr. Goodman's motion to

1    suppress must be granted, and the firearm and ammunition

2    recovered from Mr. Goodman's person must be suppressed.

3         Finally, I just want to be very clear that my ruling

4    today is not based on any general objection to the gun recovery

5    unit's tactics.  Indeed, as I said, the D.C. Circuit has

6    authorized it.  Rather, my conclusion is a narrow and fact

7    specific one.  Given the testimony, body-worn camera footage,

8    and other exhibits that were submitted at the evidentiary

9    hearing in this matter, I find that the government has not

10   satisfied its burden to demonstrate that the circumstances

11   known to Officer Bewley supported an objectively reasonable

12   suspicion that Mr. Goodman was armed and dangerous as was

13   required to justify Officer Bewley's pat-down of Mr. Goodman.

14   Mr. Goodman's motion to suppress will be granted on that basis

15   alone.

16        So that concludes the Court's ruling with respect to

17   Mr. Goodman's motion to suppress.  I will issue a separate

18   order that memorializes the ruling.

19        And I take it that the government will have to decide

20   how it intends to proceed in light of that ruling and will

21   notify the Court of such.

22        MS. PASCHALL:  Yes, Your Honor.  If Your Honor wants

23   to set a date for the government to have that decision, I would

24   ask for at least ten days.  If -- if Your Honor is -- is not

25   going to put such a deadline on the government, I will let you

1  know as quickly as possible how the government intends to

2  proceed at this time.

3          THE COURT:  Ms. Halverson, how do you feel about ten

4  days for the government's response?

5          MS. HALVERSON:  I think that's fine.  I would be

6  asking that -- that Mr. Goodman be released pending the

7  government's decision in the case given the firearm has been

8  suppressed.

9          THE COURT:  Ms. Paschall, how do you feel about

10  Ms. Halverson's request that Mr. Goodman be released in light

11  of the Court's determination?

12          MS. PASCHALL:  I think the government would ask that

13  he remain to be held, but understanding the current

14  circumstances such as they are.

15          THE COURT:  Sorry?

16          MS. PASCHALL:  I said the government's request, that

17  he remain held while we determine our -- our next course, but

18  understand the circumstances.

19          THE COURT:  Have either of you dealt with this

20  situation before?  I have not.  In other words, do both of

21  you -- one of you as an AUSA, the other as a federal public

22  defender, you have some background in this.  I'm wondering

23  whether the practice in this jurisdiction of the D.D.C. is to

24  release people pending the government's determination when the

25  only evidence has been suppressed or to give the government a

1 short period of time -- and I would say ten days is probably

2 beyond the window that I would think is appropriate,

3 Ms. Paschall, under these circumstances, but continue to hold

4 the defendant for, say, you know, five to seven days in order

5 to allow the government to decide what it wants to do

6 concerning this.

7   Do -- do we know what the practice is?

8   MS. PASCHALL:  Unfortunately, Your Honor, the only

9 other time I've had this happen, the defendant was already on

10 release, but I can make inquiries today to let the Court know

11 before the close of business what others have encountered in a

12 similar situation.

13   THE COURT:  Ms. Halverson, do you intend to do the

14 same then?  Would that work?  In other words, will you inquire

15 around, unless you've had a particular instance that is

16 similar?

17   MS. HALVERSON:  Yes, I will absolutely inquire

18 around, Your Honor.

19   I -- I will just point out -- and maybe this is -- this

20 is best placed for some kind of supplement to the Court at the

21 end of the day.  But it does appear that we're back, sort of,

22 in the Bail Reform Act sort of analysis and whether he's a

23 danger.  And so I -- I -- I just, kind of, don't see the

24 argument for holding him any longer when the only evidence has

25 been suppressed against him.

1    THE COURT:  So here's what I'll do.  We're at noon

2    right now.  I will give both parties the opportunity to inquire

3    and to file something by the end of the day that could, in

4    fact, you know, include a proposed order of release,

5    Ms. Halverson, if that's what your experience is demonstrating

6    occurs in this situation.

7    And, Ms. Paschall, you know, three pages on why the

8    government thinks he should be held, nonetheless, or, you know,

9    an indication of the government's consent to having him

10    released while the government decides whether it's going to

11    dismiss this case and/or appeal or whatever you're going to do,

12    and then I'll -- I'll rule.

13    I don't know whether we can get him out this weekend if

14    that turns out what the Court decides, if that's the practice

15    of the jurisdiction, but I will consider the parties'

16    submission and make a determination.

17    MS. HALVERSON:  And, Your Honor, could I just

18    clarify for defense submission today, did you just want, sort

19    of, informational -- from the other FPD attorneys about the

20    normal practice, or did you want a full briefing on it?  A

21    full --

22    THE COURT:  I don't think we have time for a full

23    briefing.  My -- my -- what I think I'd like to have, since --

24    since both of your offices may have experience with this, is

25    where there has been a suppression motion in a similar

1   circumstance where there is not additional evidence and the

2   government has yet to make its decision as to how it wants to

3   proceed, what happened to the defendant who is detained.

4          And I'm sure that both of you will have colleagues who

5   have dealt with situations that say the Court, you know,

6   ordered his release pending the government's determination or

7   not.  That's pretty much what I need to -- to know.

8          MS. HALVERSON:  Very well, Your Honor.

9          THE COURT:  So I'm going to give you, you know, three

10   to five pages or something to just give me some cases or some

11   background that other -- based on other people's experience of

12   the practice in this situation.

13          MS. HALVERSON:  Very well, Your Honor.

14          THE COURT:  And so I'll issue just a quick minute

15   order related to that, but if I could have that by, you know,

16   7:00 p.m., then I will rule on it tonight.

17          And if -- if he is released in the interim, we'll try to

18   get out the documents so that that can happen on Monday.  And

19   then Ms. Paschall can have her ten days or whatever to make a

20   determination about the status of the case.  And if -- if the

21   practice is to have him held, then when I rule, I'll make clear

22   that -- that the government would not get a whole ten days,

23   because we need to get to the bottom of what its intentions are

24   with respect to this case in light of his detention; okay?

25          MS. HALVERSON:  Very well, Your Honor.

1    THE COURT:  Of course -- of course, if the government

2    concedes that he is, you know -- after doing your own research,

3    you can contact one another and file a notice that tells me

4    you're fine with him being released, and we will work that out;

5    okay?

6         All right.  Thank you very much.  Have a good day.

7         (The proceedings concluded at 12:03 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9              Dated this 23rd day of April, 2021.

10

11              /s/ Nancy J. Meyer_____
                Nancy J. Meyer
12              Official Court Reporter
                Registered Diplomate Reporter
13              Certified Realtime Reporter
                333 Constitution Avenue Northwest, Room 6509
14              Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25